## UNITED STATES v. TILLINGHAST et al.
### No. 321.

District Court, D. Rhode Island.
Jan. 20, 1932.

**280**

Henry M. Boss, Jr., U. S. Atty., of Providence, R. I., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Frederick W. Dewart, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for complainant.

Hinckley, Allen, Tillinghast, Phillips & Wheeler and Edwards & Angell, all of Providence, R. I., for respondents.

LETTS, District Judge.

This is an action in equity, brought by the United States to recover the sum of $118,773.14, against the former stockholders, and the representatives of such as have deceased, of the Crefeld Waste & Batting Company, for income and excess profits taxes alleged to be due and owing to the government from that corporation for the year 1917. All the assets of this corporation were distributed to the respondents and the corporation dissolved prior to the bringing of this suit and subsequent to the accrual of the tax, if any, alleged to be due.

The Crefeld Waste & Batting Company, which will hereafter be referred to as "Crefeld," was a Rhode Island corporation, which engaged in the business of manufacturing and dealing in cotton and woolen waste. In 1905, apparently for the purpose of developing its business in the southern textile states, Crefeld caused to be organized the South Atlantic Waste Company under the laws of the state of North Carolina. Of the 1,000 shares of the capital stock of this corporation, which were issued of a par value of $100 each, Crefeld acquired 788 shares. The remaining 212 shares were held by various individuals.

Some five years later, and between March, 1910, and May, 1911, the South Atlantic Waste Company was in need of additional capital to carry on its business. This, to a total amount of $365,000, Crefeld loaned to South Atlantic, taking in evidence thereof the promissory notes of that corporation. These notes were all payable either upon demand or in three months.

Shortly thereafter there arose the consideration of a so-called plan of reorganization of the financial structure of South Atlantic and its relations with the northern company. At a meeting of the Crefeld stockholders on May 22, 1911, a reorganization plan was approved. This plan proposed that Crefeld should surrender to South Atlantic the notes evidencing the indebtedness of $365,000, provided the treasurer of South Atlantic could obtain for cancellation the 212 additional shares which were outstanding so that the same could be reissued to Crefeld. This plan was carried out, and, with the exception of a few directors' shares, the en-

tire capital stock of South Atlantic stood in the name of Crefeld. At the close of that year, as of December 30, 1911, Crefeld wrote off its books this intercompany account by debiting its profit and loss account and crediting bills receivable. Corresponding entries, after the so-called reorganization had been acted upon and during the same year, were made on the books of South Atlantic.

In March of 1912, when the company came to file its annual net income return for the year 1911, it deducted the $365,000 as a loss, evidently regarding the obligations released as either uncollectable or as an unrecoverable capital contribution to its then wholly owned subsidiary. This deduction was disallowed by the Commissioner of Internal Revenue, and an additional tax, arising from this disallowance, of $602.17 was assessed against, and paid by, Crefeld. This was done in the summer of 1917. Shortly thereafter Crefeld, not being permitted to take this loss as for the year 1911, undertook to unscramble the eggs of the reorganization and restore upon its books the charge of $365,000 against South Atlantic and in turn crediting its profit and loss account, making at the same time the following entry: "Notes of South Atlantic Waste Company determined by United States Internal Revenue Department to have been improperly charged off in 1911 as follows: [Individual notes listed]."

It does not appear that the notes in question were redelivered by South Atlantic to Crefeld.

Following this action, and in the same year, Crefeld brought suit in the state courts of Rhode Island against South Atlantic ostensibly on these notes. Judgment was entered for South Atlantic in this suit on December 4, 1917, on the ground, among others, that the notes were barred by the statute of limitations. On December 12, 1917, Crefeld again charged off the $365,000 with similar entries, as before, but accompanied by the following notation: "Invalidity of the following notes of the South Atlantic Waste Company as per judgment of the Superior Court, Providence County, State of Rhode Island, December 4, 1917: [Individual notes listed.]"

During the same month Crefeld also sold its entire stock holdings in South Atlantic for the sum of $49,700. There is no evidence that this sale was not bona fide or that it did not represent the then full market value of the stock of the subsidiary company.

Somewhat before the consummation of these steps Crefeld had begun the liquidation and distribution of its assets to its stockholders. This liquidation and distribution of assets was completed by December 31, 1918. At no time thereafter did the company possess any assets. In November, 1923, the corporation was formally dissolved and its charter surrendered under the laws of the state of Rhode Island.

On March 29, 1918, Crefeld filed with the collector of internal revenue at Hartford, Conn., a return on form 1031 designated as corporation income tax return for the calendar year 1917. This return, made after the sale of its South Atlantic stock, showed deductions in excess of the total gross income. The largest of these deductions reflected the loss claimed by Crefeld because of its unrecovered investment in South Atlantic.

Many more facts could here be stated to illuminate the ramifications of this action. To do so, however, would necessitate repetition resulting from the necessary recapitulation of those pertinent to each of the several issues to be separately considered.

Certain of the defenses raised would, if sustained, determine the whole cause of action. Others are partial defenses only, and raised by way of reduction of the amount of recovery in event the major contentions be not sustained. Each of these defenses, whether complete or partial, will be here dealt with, to the end that, in event of appeal, the controversy in its entirety may be before the court for final disposition. Succinctly stated, the various defenses interposed raise the following questions:

(1) Should the suit be dismissed because of lack of authority or sanction by the Commissioner of Internal Revenue?

(2) Is the action barred by limitation?

(3) Has the complainant established its case in so far as it is based upon the disallowance of the deductions taken by Crefeld because of the losses arising from advances to South Atlantic?

(4) Were certain rentals, paid and first agreed upon in 1917, in respect to an occupancy during prior years, properly deductible by Crefeld in the year paid?

(5) Were certain switching charges paid in 1917, but for services rendered prior thereto, deductible in the year paid?

(6) In event of recovery by the complainant, would the respondents severally be entitled to set off any part of the personal taxes already paid by them on reported profits received in the distribution of Crefeld's assets, which profits would be reduced by any recovery allowed the complainant?

These questions will be considered in the order stated.

█ The first issue raised is predicated upon the alleged noncompliance by the government with the requirements of section 3214, Rev. St. (26 USCA § 143), the relevant part of which is as follows: "No suit for the recovery of taxes, or of any fine, penalty, or forfeiture, shall be commenced unless the Commissioner of Internal Revenue authorizes or sanctions the proceedings."

Under date of November 17, 1925, D. H. Blair, then Commissioner of Internal Revenue, sent to the United States Attorney for the District of Rhode Island the following letter:

"Sir: Reference is made to an unpaid assessment of corporation income and profits tax in the amount of $118,773.14, against the corporation above named for the year 1917.

"The corporation has been dissolved, and efforts to collect this tax having failed, you are hereby authorized to institute a suit in equity against the former stockholders of the corporation for the collection of this tax; for your convenience in so doing, there are herewith enclosed a bill of complaint in equity with five carbon copies thereof. The records of this office indicate that the residences of the defendants are as follows:

"Lawrence A. Lockwood, 204 Westminster St., Providence, R. I., or East Greenwich, R. I.

"Mary D. A. Sayles, Pawtucket, R. I.

"Charles O. Read and Mary E. Read (husband and wife) 63 Summit Street, Pawtucket, R. I.

"Albert M. Read, Arlington, Pawtucket, R. I.

"Frank A. Sayles, address unknown.

"You are requested to sign and file the bill of complaint at your earliest convenience and have process issued for service upon the defendants.

"Please acknowledge receipt of this letter and keep this office advised as to further developments in the case. You may call upon the Collector of Internal Revenue for the District of Rhode Island, and this office for such assistance as you may require in the prosecution of this suit. Certified photostat copies of the pertinent papers will be prepared and transmitted to you in the near future."

On November 24 the United States attorney, in compliance with this direction, instituted in this court a suit, the bill of complaint in which appears as United States Exhibit 14 in this action. It involved the same subject-matter as the present action, and was brought against the same respondents here appearing, or their predecessors in interest. This suit was dismissed on November 19, 1928, for lack of prosecution under a standing order of this court after ample notice had been given the government and one or more extensions granted.

Under date of February 27, 1929, the United States Attorney for the District of Rhode Island was sent the following communication over the signature of C. M. Charest, General Counsel for the Bureau of Internal Revenue:

"Sir: Reference is made to your letter of November 20, 1928, in the above-entitled case.

"This office has just been advised by the Department of Justice that the Solicitor General has declined to authorize an appeal from the Court's order of November 19, 1928, dismissing the above-entitled case without prejudice, but has no objection to the institution of a new suit.

"This office accordingly requests that a new suit be instituted for the collection of the income and excess profits taxes assessed against the Crefeld Waste & Batting Company on March 22, 1923, without delay, as the six-year period of limitations as provided by Section 278 (d) of the Revenue Act of 1926 might be held by the Court to have started to run from the date of assessment, (namely March 22, 1923) as was held by the District Court of Nebraska in the case of United States v. Nelson B. Updike et al., 25 Fed. (2d) 746. In that event the time within which suit could be commenced would expire on March 22, 1929. The Updike Case has been appealed.

"Information has been received by this office that some of the defendants in the former suit are now deceased. In view of the decision of the Circuit Court of Appeals in the case of United States v. R. E. Armstrong et al. (26 Fed. (2d) 227) it is suggested that all the former defendants or their representatives should be made parties defendants.

"In order to keep its records complete this office would appreciate being sent a copy of the complaint filed in the case; and will be glad to render such assistance in the preparation and trial of the case as you may desire."

On March 21, 1929, the present action was begun. Under date of January 6, 1931, and before any hearing was held in the present cause, David Burnet, then Commissioner of Internal Revenue, sent to the United States attorney the following communication:

"Sir: Reference is made to an unpaid assessment of corporation income and profits taxes in the amount of $118,773.14 against the corporation above named, for the year 1917.

"The corporation having been dissolved, and efforts to collect this tax having failed, you were duly authorized by the former Commissioner of Internal Revenue to institute a suit in equity against the former stockholders of the corporation for the collection of this tax.

"The filing by your office of the Bill of Complaint in the above action, on or about March 21, 1929, was in compliance with that authority and was duly authorized, and is hereby sanctioned and approved by me."

It is now contended by the respondents that the present action was not authorized or sanctioned by the Commissioner, as required by said section 3214. It is true that the record discloses no express authorization from the Commissioner received by the United States attorney following the dismissal of the first suit and before the filing of the second bill of complaint. The point raised must turn upon the construction of Rev. St. § 3214.

The clear intention on the part of Congress was to guard against the indiscriminate authorization of suits by subordinate officials or employees connected with the Bureau of Internal Revenue and to make sure that such authorization or approval should emanate from a responsible official, in this instance the Commissioner. We are not concerned with the shifting personnel in that office. We are concerned with whether the Commissioner authorized or sanctioned the commencement of this suit. The United States attorney for this district was authorized by the letter first quoted to institute proceedings upon the subject-matter here involved, and, though we ignore the communication of the General Counsel of the Bureau, it is evident from the Commissioner's letter of January 6, 1931, that the commencement of the present action received his full sanction and approval.

Counsel for the respondents, both in their briefs and oral arguments, have undertaken to construe section 3214 as if it meant that no suit shall be commenced unless authorized in advance by the Commissioner. They entirely ignore the significance of "authorizes or sanctions." If the term "authorizes" alone had been used, respondents' contention would be much more persuasive. The verb "sanction" has very definitely in the language a distinct and different shade of meaning from "authorize." Repeatedly in the arena of lawmaking, acts of the President, particularly on occasions of national emergency, have, upon the reconvening of Congress, been by it sanctioned. "Sanction" means to assent, to concur, to confirm, or ratify. "Sanction" may necessitate no more than to countenance, although, as the term is here used, where legal rights are involved, it is doubtful if it should be construed as requiring less than an unmistakable expression of approval. The provision of the section which respondents emphasize, "No suit * * * shall be commenced," is probably directory, and would not affect the status of an action, "the proceedings" of which are in fact approved before hearing. Quite apart from the legal effect of the Commissioner's last communication, his original letter of November 17, in the absence of any showing of change of attitude, is sufficient.

The first defense interposed by the respondents is without merit.

We come now to the query, Is this action barred by limitation? Prior to the hearing had upon the bill and answer, the respondents moved to dismiss the bill on the ground that it appeared upon its face that the action was barred by the statute of limitations. This motion was denied. Because, however, the statutory provision was set up as a plea in bar in the answer, the respondents were permitted at the time of trial to introduce evidence bearing upon its applicability in this case. The only statute of limitations pertinent to this case is section 250 (d) of the Revenue Act of 1921 (42 Stat. 264). It provides as follows: "The amount of income, excess-profits, or war-profits taxes * * * due under any return made under this Act for prior taxable years or under prior income, excess-profits, or war-profits tax Acts, * * * shall be determined and assessed within five years after the return was filed, * * * and no

suit or proceeding for the collection of any such taxes due under this Act or under prior income, excess-profits, or war-profits tax Acts, * * * shall be begun, after the expiration of five years after the date when such return was filed, * * * Provided further, That in the case of a false or fraudulent return with intent to evade tax, or of a failure to file a required return, the amount of tax due may be determined, assessed, and collected, and a suit or proceeding for the collection of such amount may be begun, at any time after it becomes due. * * * "

On March 29, 1918, Crefeld filed a properly executed return of income for the year 1917 on Form 1031 designated as "Corporation Income Tax Return." This return was filed within the time as extended by the Commissioner. The return showed a net loss to Crefeld for the year of over $47,000. This net loss was occasioned by certain large deductions taken by Crefeld, the principal one of which was for something over $350,000 growing out of the losses which Crefeld had sustained in its dealings with South Atlantic. These transactions have already been stated.

Under the practice and regulations of the Commissioner, effective for the year 1917, there was a further supplemental or accompanying return blank to be used, Form 1103, for corporations subject to a corporation excess profits tax. Under both the regulations and the instructions incorporated upon the face of the return blanks, Form 1103 was to be filed by every corporation having a net income of over $3,000 for the taxable year. Crefeld, in compiling its return arrived at a result, as before stated, showing a substantial net loss. It did not, therefore, make any return upon the supplemental or accompanying Form 1103.

Approximately four years later, the Commissioner directed a review and audit of Crefeld's return for 1917; Crefeld in the meantime having liquidated and distributed its remaining assets to its stockholders. Following this review and audit, the Commissioner disallowed the loss on the intercompany relations with South Atlantic, as well as certain other minor deductions which Crefeld in its return had taken.

After a lapse of approximately another year, in March of 1923, the Commissioner determined that income and excess profits taxes in the amount of $118,773.14 were due from Crefeld and the same were assessed. Somewhat more than two years elapsed following the assessment when suit was instituted against the stockholders of Crefeld who had received the distributed assets upon liquidation. For reasons wholly unexplained, there was no prosecution of this action, and on November 19, 1928, it was dismissed for lack of prosecution.

In 1929 this present action was instituted, and, although brought against stockholders of Crefeld to recover corporate assets, it is a suit for taxes and predicated solely upon the corporation's liability therefor. United States v. Updike, 281 U. S. 489, 50 S. Ct. 367, 74 L. Ed. 984.

It seems clear from this record of delay on the part of the agencies of the government that the reasons of social welfare, underlying the principles of statutes of limitation, require that every reasonable doubt as to the applicability of the statute in this case be resolved in favor of the taxpayer.

In the present case, the government rests its contention that it may bring suit eleven years after the date that the return in question was filed solely upon the ground that, the Commissioner having determined that the corporation's net income was in excess of $3,000 by virtue of the disallowance of deductions claimed by Crefeld, there was a duty upon the corporation to have made a return upon Form 1103. It is urged that, that not having been done, it is a "no return" case, and that the rights of the government arise under the last clause of section 250 (d): " * * * Provided further, That in the case of a false or fraudulent return with intent to evade tax, or of a failure to file a required return, * * * a suit or proceeding for the collection of such amount may be begun, at any time after it becomes due. * * * "

Throughout the several briefs filed on behalf of the complainant, the contention that this is a case of a failure to file a required return is bolstered by repeated assertions that the return filed by Crefeld "was false and fraudulent with intent to evade tax." So eloquent was counsel for the government at one point in impeaching the motives of the respondents and steps taken by their counsel that he purports to quote from the Psalmist: "Behold, I was shapen in iniquity and in sin did my Mother conceive me." The action brought in the state court of Rhode Island in 1917, to effect a legal adjudication of the loss, is referred to in the government's brief as a "fraudulent suit."

Nowhere in the record or travel of the case is there any basis in fact to justify the claim. No cause is strengthened by substi-

tuting assertion for analysis or charlatanry for reasoning. The return as filed upon Form 1031 discloses income received and items of deduction which had in good faith been claimed by Crefeld. Where a basic return, as here, was required on Form 1031 and a supplemental or accompanying return also provided, with directions for its use and when to be used, it must be the intendment of the law that, if the taxpayer's computation, made in good faith, upon the basic return, shows a result which in compliance with the directions and regulations leaves nothing to be carried forward upon the supplemental return, he does not lose his right of protection from delayed suit and examination, provided by the statute of limitations. In the present instance, there was nothing for the taxpayer to report on Form 1103 without relinquishing his contention that the items deducted as losses were properly deducted. That position the taxpayer has stoutly maintained and has here submitted the rightfulness of its contention for adjudication in this case.

The court in the case of Florsheim Bros. Drygoods Co. v. United States, 280 U. S. 453, 50 S. Ct. 215, 218, 74 L. Ed. 542, had before it a question of whether a "tentative return and estimate of corporate income profits tax and request for extension of time for filing return" was sufficient to start the period of limitation. The court, while holding that such a return did not so do, said by way of dicta: " * * * It may be true that the filing of a return which is defective or incomplete under section 239 is sufficient to start the running of the period of limitation; and that the filing of an amended return does not toll the period. But the defective or incomplete return purports to be a specific statement of the items of income, deductions and credits in compliance with section 239. And, to have that effect, it must honestly and reasonably be intended as such. * * * *"

In United States v. Mabel Elevator Co. (D. C.) 17 F.(2d) 109, at page 110, the court said: "It comes down to the question as to whether, when a taxpayer makes an honest return, which he believes to be in compliance with the law, the government can assess a deficiency against him after the expiration of 5 years, on the ground that it was not in strict compliance with the law. This question, it seems to me, must be answered in the negative, as it was answered by the United States Board of Tax Appeals, whose decision is reported in 2 B. T. A. 517. Otherwise, there would practically be no period of limitation whatsoever, and every man who made an inaccurate return could have a deficiency assessed against him at any time, because an inaccurate return is not a return made strictly in compliance with the law." See United States v. Updike (D. C.) 1 F. (2d) 550, affirmed Updike v. United States (C. C. A.) 8 F.(2d) 913; United States v. Updike (D. C.) 25 F.(2d) 746, affirmed (C. C. A.) 32 F.(2d) 1; Id., 281 U. S. 489, 50 S. Ct. 367, 74 L. Ed. 984; Rockland & Rockport Lime Corp. v. Ham (D. C.) 38 F.(2d) 239; Beam v. Hamilton (C. C. A.) 289 F. 9.

These cases, while employing general statements seemingly in support of complainant's contention, are, I believe, distinguishable, and should be limited to their exact facts and holdings.

I am of the opinion that under the facts in this case the period of limitations began to run from and after the date of the filing of the return, and that, being pleaded in the answer as a defense, is a bar to recovery by the complainant.

We now come to the question of whether the assessment of the additional tax in the amount of $118,773.14 was correct, in so far as it is based upon an allowance of $35,394.20 as the loss on the sale of South Atlantic stock in 1917.

The effect of the transaction in 1911, when Crefeld surrendered the notes of South Atlantic, was an additional contribution or capital investment in South Atlantic, and at that time Crefeld received, not merely the 206 shares of additional stock, but some enhancement in the value of the other 788 shares already held.

That there was a much larger loss than $35,394.20 suffered by Crefeld from its investment in South Atlantic, no part of which had been allowed as a deduction in any prior year, is undeniable. In 1905 Crefeld had invested $78,800 in South Atlantic, for which it held 788 shares of its capital stock. It subsequently loaned to South Atlantic $365,000, and in 1911 surrendered its notes in that amount, acquiring all of South Atlantic's outstanding stock except six directors' shares. This represented a total investment in the capital of South Atlantic of $443,800. In 1917 all of this stock was sold for $49,700, resulting in a total loss of $394,100.

The controlling statutory provision is found in the Revenue Act of 1916, 39 Stat. 756 (as amended by the Act of October 3, 1917, 40 Stat. 300). Section 10 (a) of this act (39 Stat. 765, as amended) provides:

"For the purpose of ascertaining the gain derived or loss sustained from the sale or other disposition by a corporation * * * of property, real, personal, or mixed, acquired before March first, nineteen hundred and thirteen, the fair market price or value of such property as of March first, nineteen hundred and thirteen, shall be the basis for determining the amount of such gain derived or loss sustained."

██ No one will seriously contend that the fair value of Crefeld's holdings in South Atlantic, after the so-called reorganization in 1911, or as of March 1, 1913, was equal to the total investment of $443,800. Under the holding in the case of Burnet v. Houston, 283 U. S. 223, 51 S. Ct. 413, 415, 75 L. Ed. 991, a lesser figure, representing the fair market price or value of those holdings, should therefore be taken as the basis of determining the deductible loss. The testimony presented clearly shows that as of March 1, 1913, there was no established or ascertainable market price for the shares. What, then, was their fair value? The Commissioner placed a value upon the shares which was used as a base from which he determined a deductible loss of $35,394.20. The method employed by the Commissioner in determining that value will hereafter be reviewed. Based upon this determination, the assessment was made and must stand as prima facie valid, unless and until the evidence adduced by the respondents discredit the determination. Wickwire v. Reinecke, 275 U. S. 101, 48 S. Ct. 43, 72 L. Ed. 184; Reinecke v. Spalding, 280 U. S. 227, 50 S. Ct. 96, 74 L. Ed. 385; Niles Bement Pond Co. v. United States, 281 U. S. 357, 50 S. Ct. 251, 74 L. Ed. 901.

██ In considering the extent of the reliance that will be placed upon the presumption of the validity of the Commissioner's determination, sight should not be lost of the fact that this suit is not one against the taxpayer who may reasonably and properly be presumed to be in possession of all necessary information to enable him to carry the burden of a full disclosure and proof of income. This is a suit against numerous stockholders brought, not against the government, but by the government. The situation, therefore, is such that, if the Commissioner's assessment be discredited, the burden of proof must remain with the claimant, as in any other case. He who asserts a claim should establish it.

In the case of Burnet v. Houston, supra, the court said: " * * * The impossibility of proving a material fact upon which the right to relief depends simply leaves the claimant upon whom the burden rests with an unenforceable claim, a misfortune to be borne by him, as it must be borne in other cases, as the result of a failure of proof. * * * "

The government has relied wholly upon the prima facie case established by the proof of the assessment. There is no adequate testimony in the record upon which a revised determination could be based. The case then turns upon the question, Does the evidence affirmatively discredit the determination of value of the shares in South Atlantic as made by the Commissioner?

Under date of September 28, 1922, the acting Deputy Commissioner wrote Crefeld, Exhibit E Stipulation of Facts, accompanying the letter with a statement wherein the following appears: "The net income for 1917, $304,712.78, as reported by the examining officer has been found to be correct."

Under date of November 22, 1922, the Deputy Commissioner again wrote Crefeld, a portion of which letter is as follows:

"In view of the fact that the notes aggregating $365,000.00 held by your corporation were surrendered for 206 shares of stock of the North Atlantic Waste Company [1] in the year 1911, no gain was realized and no loss sustained in that year since in effect the asset received stands for the one given in. The action of the examining officer in disallowing the loss claimed on the 1911 return is, therefore, sustained.

"You are advised that in the determination of gain or loss from the sale of 206 shares of stock in question which took place during the year 1917, the fair market value of the stock as at March 1, 1913, and not the cost, should be used as the basis for computation. (Article 1561 Regulations 62).

"The balance sheet of the North Atlantic Waste Company as at January 1, 1913, was used by the examining officer as a basis for determining the value of the stock as at March 1, 1913, and in the absence of evidence of a different value this basis has been accepted by this office as correct.

"It, therefore, appears that there is no reason for change in the tax as shown in office letter dated September 28, 1922."

There is also before us the full report and computation of the agent in charge. An analysis of this report and comparison of the computation and figures accompanying

_____
[1] Error in name.

the correspondence with the Commissioner establishes beyond any reasonable doubt, not only how the result was reached, but also that the Commissioner adopted practically in toto the computation and method used by the agent in his report. On page 11 of that report appears the following:

"The March 1, 1913, value was determined from a Balance Sheet as at January 1, 1913. It is presumed no radical change took place between January 1, 1913, and March 1, 1913.

"In accordance with the latest Departmental Ruling the loss was determined as follows:

| 788 | shs | Mar. | 1, | '13 | value | $71881.36 |
|---|---|---|---|---|---|---|
| 206 | shs | | | | Cost | 13212.84 |

| | | | | |
|---|---|---|---|---|
| Sell. | Price | $39400. | Loss | $32481.36 |
| Sell. | Price | 10300. | Loss | 2912.84 |

Loss allowed for tax return $35394.20"

It is clear that the only basis of determining the value of this stock was an analysis of certain balance sheets of South Atlantic, and, in addition, we find that the shares were not even valued at the same price. The 788 shares were given a value based upon a balance sheet of the corporation as of January 1, 1913, and a value placed thereon of $91.22 per share. The 206 shares were valued at $13,212.84 or $64.14 per share. Counsel for the complainant at page 24 of government's brief states, obviously referring to the 206 shares: "The cost allowed was the full book value of the stock in December, 1911. * * *" In other words, the figure used by the Commissioner in respect to the 206 shares is not even an alleged book value of March, 1913, but an alleged cost in 1911.

 The reason for thus placing one value on the 788 shares and another upon the 206 shares, for the purpose of determining the deductible loss, is based upon the assumption that the cost of the latter was lower than the March 1, 1913, value, and should therefore be taken. With the propriety of so doing we would not differ if there were any legal basis for the assumption.

United States v. Flannery, 268 U. S. 98, 45 S. Ct. 420, 69 L. Ed. 865. Novel indeed, however, is the method of figuring cost by resort to the book value of the thing purchased. No consideration seems to have been given to the value, as of the date of surrender, of the notes aggregating $365,000, which, if not collectible to substantially the full amount, would have left nothing by way of value to attach to the 788 shares which the Commissioner finds to be worth over $90

per share March 1, 1913, and must have been worth the same amount in 1911, as the 206 shares for which a value is found of over $64 per share after giving effect in the South Atlantic balance sheet to the cancellation of the notes. It is from this somewhat surprising calculation that the sum of $35,394.20 is derived as the deductible loss of Crefeld, and upon it is largely predicated the assessment of $118,773.14 of additional tax.

There is also testimony which was presented by the respondents in regard to the development of the business of South Atlantic which compels the conclusion that no proper determination of the value of that corporation's stock could be made without taking into account factors not reflected by the balance sheets of the corporation which are before us.

It is of passing interest that the present law in a case like the one before us specifically emphasizes the due regard to be given to the market value of the assets as of March 1, 1913. This directory provision incorporated since the enactment of the Revenue Act of 1916 is probably no alteration of what was previously necessary. In this case, it is apparent that the Commissioner made no inquiry and gave no consideration to anything other than the balance sheet entries as of dates within a few months of the time to which his determinations were to relate.

I am forced, therefore, to the conclusion as reached by the court in the case of Russell v. Commissioner (C. C. A.) 45 F.(2d) 100, 103: "While there is a presumption that the commissioner's findings are correct, * * * when it appears, as in this record it does appear, that the methods pursued by the commissioner were mathematically and legally erroneous, that presumption no longer avails."

The bare assessment, therefore, unaccompanied by other proof, and plainly discredited as to accuracy and proper basis, leaves the complainant in the position of not having established a claim in respect to which it, not the respondents, has the burden of proof.

 The question presented by the disallowance by the Commissioner of the item for additional rent is analogous to that raised by the disallowance of the switching charges. Both will be considered together.

Crefeld's return was on an accrual basis. The Crefeld Company prior to 1913 leased certain premises from Frank A. Sayles. Late in 1913 or early 1914 the company moved to better quarters owned by the same party, but without at that time agreeing upon the amount of rent which should be paid for the new quarters. During the year 1917, an agreement as to the rental to be paid was reached, and the sum of $14,766.52 was by both parties fixed as the sum which should be paid for the years 1913 to 1916, inclusive. This sum was paid by Crefeld during the year 1917. The corporation in computing its income for the year 1917 deducted the total of this rental item as an expense. It was disallowed by the Commissioner of Internal Revenue on the ground that it was not a deductible business expense for that year.

The other item—that of $26,302.64—was for certain switching charges paid to the Moshassuck Valley Railroad Company in 1917, but for services which had been rendered previous to 1915. The inference is compelling that Crefeld at the time these services were rendered did not expect to be called upon to pay them, although bills from time to time were rendered by the railroad company. It appears that the matter was in some way called to the attention of the Interstate Commerce Commission, which regarded the situation in the light of special favors granted to Crefeld by the railroad company in the nature of rebates. During 1917, apparently upon the order or suggestion of the Commission, the entire sum was paid to the railroad company by Crefeld and deducted as a business expense for that year. This item was disallowed by the Commissioner of Internal Revenue as not a deductible business expense for 1917.

The case of Aluminum Castings Co. v. Routzahn, 282 U. S. 92, 51 S. Ct. 11, 75 L. Ed. 234, appears to be decisive in respect to both of these items. It was agreed that an additional rental would be paid, and the position of the taxpayer cannot be altered or bettered by his own delay in adjusting the amount.

As to the switching charges, bills from time to time had been submitted to Crefeld and not entered upon the corporation's books because the management did not anticipate they would be pressed. They were, however, legal obligations as of the periods during which the services were rendered and later recognized as such by Crefeld.

The Commissioner was justified in disallowing these items as business expenses for the year 1917.

The respondents in their answer have asserted a counterclaim or set-off predicated upon the contention that, if it should be found that the complainant is entitled to recover, the respondents should be credited with the amounts by which their personal income taxes were increased during the years 1917 and 1918 because of the profit reported by each from the distribution of the Crefeld assets. In other words, each stockholder of Crefeld, upon its liquidation, received back more than had been originally invested in the stock of that corporation. No evidence, other than some individual returns showing the fact of the inclusion of such profits, was presented by the respondents as to what the amount of such claimed allowance would be. Obviously, its ascertainment would necessitate a somewhat intricate calculation in respect to the reported income of each respondent.

The respondents' contention in this regard presents grave difficulties, both as a matter of law and equity. In litigation of this character, where it becomes necessary for the government, in order to collect a tax due from a corporation, to pursue assets in the hands of stockholders, the remedy to the government should be simple and direct. It ought not to be necessary to involve such relief in a maze of separate and individual problems. Such would be the result if each individual stockholder's tax had to be determined and the extent to which that tax had been increased by virtue of the corporate assets distributed. With a corporation of many stockholders, and the principle there would be the same as here, the undertaking would be hopeless. To apply the law on any such basis would substantially necessitate the abandonment of the recognized principle that the obligation of the stockholder, if liable, is both joint and several, and that the assets received by each stockholder are impressed with a trust for the payment of the corporate obligation to the full extent of whatever assets were received. See Phillips v. Commissioner of Internal Revenue (C. C. A.) 42 F. (2d) 177; United States v. Updike (D. C.) 1 F. (2d) 550, affirmed (C. C. A.) 8 F. (2d) 913.

I am mindful that a contrary conclusion appears to have been reached by the Circuit Court of Appeals for the Second Circuit in the case of United States v. Klausner, 25 F. (2d) 608, 611. The decision reached in that case would seem to establish a

precedent which, if followed to its logical conclusion, would obstruct the expeditious collection of government revenues, a situation upon which the Supreme Court on repeated occasions has forcefully frowned. With that phase of the Klausner decision I do not agree.

■ It is elementary that no claim can be pressed against the government except by consent, and such consent may not by the court be enlarged by implication or indirection. Price v. United States, 174 U. S. 373, 19 S. Ct. 765, 43 L. Ed. 1011; Eastern Transp. Co. v. United States, 272 U. S. 675, 47 S. Ct. 289, 71 L. Ed. 472; United States v. Michel, 282 U. S. 656, 51 S. Ct. 284, 75 L. Ed. 598.

Section 3226, Rev. St., as re-enacted by the Revenue Act of 1926, § 1113 (a), 26 USCA § 156, provides as follows: "No suit or proceeding shall be maintained in any court for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected until a claim for refund or credit has been duly filed with the Commissioner of Internal Revenue, according to the provisions of law in that regard, and the regulations of the Secretary of the Treasury established in pursuance thereof; but such suit or proceeding may be maintained, whether or not such tax, penalty, or sum has been paid under protest or duress. No such suit or proceeding shall be begun before the expiration of six months from the date of filing such claim unless the commissioner renders a decision thereon within that time, nor after the expiration of five years from the date of the payment of such tax, penalty, or sum, unless such suit or proceeding is begun within two years after the disallowance of the part of such claim to which such suit or proceeding relates. The commissioner shall within 90 days after any such disallowance notify the taxpayer thereof by mail:"

The broad language of section 3226 specifically constitutes a limitation upon the recovery of excessive taxes paid and the manner in which such claims must be presented, whether the tax has been erroneously or illegally assessed or collected. To now permit in a proceeding of this character the ascertainment and allowance of a credit would involve in substance, not only a refund, but in effect its recovery or allowance as of a time long after such claims have been barred by express limitations. Practically and legally, the contention is unsound.

The fact of the action which was brought in the state court of Rhode Island by Crefeld has not been overlooked. It was, in my opinion, without legal effect or significance.

A draft decree, consistent with the conclusions herein stated, may be presented for settlement.